I know we disagree on that point, but I think it's pretty straightforward. In Illinois, an employee under Melina v. Anheuser-Busch must have actual knowledge that he's entered into a contract. He must have an understanding that a binding agreement has been entered into. It is uncontested in this case that Raj Gupta had no such understanding. He never saw the email in the first place. He never read the email he didn't see. He never opened the email he didn't see. He had no knowledge of the underlying contract. The first time he found out was in the motion to compel arbitration below. Now the parties have cited a number of cases. In fact, a reply brief I think is probably one of the few times I've found my reply brief more critical than even my opening brief because Morgan Stanley lays out maybe 15 cases that they feel support this proposition that you can have acceptance by silence when you don't have knowledge. And yet, the vast majority of those cases with three or four exceptions really show us that actual knowledge, at least of the offer, was had. Case after case, we had training. We take a look at the AT&T cases, Vermeer's, Winters, and Rivera-Colón, of course, which lays it out. Three emails, we've got training, we've got click the box. We know that people have seen that agreement. We know that they know that if they fail to opt out, they're going to be held to a binding agreement. Does the context of the relationship matter, whether it's consumer versus employment? It very much does. It very much does because Molina v. Anheuser-Busch is an employment case. The question here is a contract. We're entering into a contract and an employee, because that's what Molina is referencing, is about an employee cannot enter into a contract without having an understanding that a binding agreement would be entered into. I have a confession to make. I filed an amicus brief in Molina some 13 years ago, arguing for the knowing and voluntary standard. I still think I'm right, but you know what? The Supreme Court of Illinois has ruled, and so under Illinois law, now what it is is at least an understanding that a binding agreement has been entered into. That we do not have here. The only cases, the only cases at all, in which we're looking at a situation that match this, one is the First Circuit's opinion in Campbell v. General Dynamics. The First Circuit said, you know, that doesn't cut it. You can't send a single email and expect that somebody is going to know. The other are the three Morgan Stanley cases in the Southern District of New York, which rely on Manigault v. Macy's East, where the Second Circuit doesn't even address the issue at all. But Manigault relies on three, it's not the New York Supreme Court, it's the Supreme Court of Appeals of New York. I always mess that up. It's the Court of Appeals of New York. Thank you. Which all three very clearly have actual knowledge. The first one, Botini, the person there was told, we're going to lower your compensation. He says, no, I'm not dealing with that, and he goes home. And he doesn't come back to work for three days. And then finally he says, oh, okay, I'm going to come back to work. There's no question that there's actual knowledge there. The second one, which I believe was Hansen, there was a sit-down explanation and discussion of it. And in the third one, there was a statement to him that we're going to lower your income on these things. So all of those three cases which support Manigault, or which Manigault thinks supports it, already come to the same conclusion. But this is Illinois. Mr. Madoff, can I return you to Molina? Certainly. One of the things that ... It's a question about how you read the case. And I read the Illinois Supreme Court as putting not nearly as much emphasis as you may on Joanne Molina signing that acknowledgment form, but rather on just her receipt of that, I don't know what it was called, that initial notice, and then continuing to work. Am I off in the way I read that? I believe so, Your Honor, because we don't need to discuss whether she signed it. She signed it. It doesn't need a lot of discussion. That's a fact that is there. The key is what's making Molina, is that we're not going to accept this knowing involuntary standard that she is suggesting. That is something more than understanding that a binding agreement is being entered into. There's no question you're right about that as far as the legal principle goes. But when the Illinois Supreme Court turned to apply the rule to the facts, what it seemed to place emphasis on was just her receipt of that initial material from Anheuser-Busch and then her continuing to work. It did not place emphasis, at least as I read it, on her signing. It's not a question of emphasis. It didn't have to. This is what I'm trying to say. She did sign it. If she hadn't signed it and we had that question, then the court would have to explain its reasoning there and it would have to put emphasis. But we already have that it's signed. We know this. We know, A, that she knew about the agreement. She signed it. She saw it. There's no question that Anheuser-Busch has proven that she saw it. Two, we know in that offer that she saw in it that if you don't, if you continue to work is what it is, not really an opt-out, if you continue to work, you're going to be bound by it. Once she has those two pieces of information, she has, now we go to the legal principle of the case, an understanding that a binding agreement has been entered into. Now we could shift those facts and we could say, all right, maybe she didn't have any knowledge of it at all. Maybe she received it and we go back to the inbox. But you see, that's not what happened. So the result is the Supreme Court didn't speak to that issue. It didn't need to. If we had that different issue, we'd be talking about a different case under Molina. The legal principle is that you have to have an understanding that a binding agreement has been entered into. But Your Honor asked me, would it be different in another context? And it would. Because in the consumer context, then we go to section 69-1A. Because this is where the gas company is sending out bills. And now they're going to raise something two cents. And that would have an effect on how we're going to be able to do things. And that's what section 69-1A does. I did a search, a very detailed search. I found only two cases that went that way, that cited 69-1A. And they're consumer cases. We don't have other cases addressing it. In the employment context, we have the Supreme Court's statement in Molina. And of course, section 69-1B and 69-1C give us the points where you have to have intent. Appellant agrees there's a valid offer here and valid consideration. The only thing at issue is the acceptance. Is that correct? Yes. If there's nothing further at this moment, I'd like to reserve the balance of my time for rebuttal. That's fine. Mr. Gerber. Thank you. May it please the Court, Tracy Gerber for Appellee's Morgan Stanley Smith Barney LLC and Morgan Stanley Smith Barney F.A. Notes Holdings LLC. The District Court properly granted Morgan Stanley's motion to compel arbitration under the Federal Arbitration Act, and its decision should be affirmed. The parties entered into a valid and enforceable arbitration agreement under Illinois law, and the operative facts here are not in dispute. At 4.30 p.m. on September 2, 2015, while an employee of Morgan Stanley, Morgan Stanley delivered to Gupta's personalized work email address an email from Human Resources with the subject line, Expansion of Care Arbitration Program. The subject line was repeated in enlarged font at the top of the email, and the email goes on to use the word arbitration 24 more times. The body of the email explicitly and unambiguously explained that, in plain English, final binding arbitration would be mandatory for all employees effective October 2, 2015, and it specified that by continuing employment with Morgan Stanley, the employee would be bound to arbitrate unless the employee opted out. In this case, it has been stipulated that the Care Arbitration Program email arrived in Mr. Gupta's work inbox. In addition to email, Morgan Stanley posted a notice about the expansion of its mandatory arbitration program and the deadline for opt-outs on meatms.com, which was the internal HR intranet site that employees used to access important HR-related information. By continuing his employment and failing to opt out of the arbitration agreement, Gupta agreed to its terms, which required him to arbitrate all claims that arise out of his employment with Morgan Stanley. The crux of his appeal is the manner in which Morgan Stanley delivered its offer to him. He offers a litany of other, more efficacious ways that he believes that Morgan Stanley should have used to deliver the offer to, quote, ensure, end quote, that he had knowledge. The law, however, does not mandate that any of these alternative methods of delivery proposed by Mr. Gupta be used. It matters not whether Morgan Stanley could have done this differently. The question is whether or not the email that indisputably arrived in Gupta's email inbox was sufficient to constitute an offer giving rise to an enforceable arbitration agreement. It was. Neither the FAA nor Illinois law impose an obligation on Morgan Stanley to ensure that Gupta knew of or understood the content of the email in order to have accepted it. Illinois law is clear that notice, not subjectively measured knowledge applicable to a particular recipient, is required for an arbitration agreement to be enforceable. The parties agree that MELINA is the key case on Illinois law here, but the parties disagree on what MELINA stands for. We believe that MELINA's actual knowledge of the offer had no bearing on the enforceability of the arbitration agreement at issue there, which the court found to have been formed when the employer mailed the dispute resolution program to MELINA, which happened almost a year prior to MELINA's acknowledgment of the handbook that contained a reference to the arbitration agreement. The court stated as much, and the Northern District of Illinois in the Pullman v. NCR Corp case applied it in that manner. In that case, the employer mailed its employees a brochure describing a new arbitration policy that they would be able to pursue by continuing their employment, and that mailing, which did not have return receipt, and which Pullman stated he couldn't remember and he denied knowledge of, was an offer that was accepted by Pullman's continued employment. Citing to MELINA at page two of the opinion, the Pullman courts held that, quote, under Illinois law, an employer mailing materials containing an arbitration agreement and the method of acceptance constitutes an offer. Delivery was the key in Pullman, not knowledge. In fact, the Pullman court did not discuss Pullman's knowledge of the offer as a consideration bearing on whether an agreement had been formed at all. Once the court determined that NCR Corp had delivered the alternative resolution program brochure via U.S. mail to the address that Pullman used, and that Pullman could not rebut the presumption that the mailed offer was delivered, it was game over. So delivery equals acceptance? Yes. Is your position? Yes. And here, had the CARE arbitration agreement been delivered by postal service, by U.S. mail, I don't think that we would be able to even be here, because the presumption would be that Mr. Gupta received it. And here, the presumption is undisputable, because we now have a stipulation that it was received. We have a disagreement of what received actually means. Mr. Gupta says it means knowledge. There is no case law to support that received means knowledge. Suppose that Morgan Stanley in October decides that it's going to change an aspect of its vacation policy to prevent employers from cashing out unused vacation, and going to more of a use it or lose it scenario. And they send an email out to that effect. And you get to the end of the year, loads of people haven't seen the email, and they get into the early in the year, and they realize, not only have I lost vacation, I've also lost a lot of money. And the email's in my inbox, but I never saw the thing. Same analysis apply? I believe the same analysis would apply, because we're talking here about notice. And what Mr. Gupta takes issue with is the sufficiency of the notice, and whether- I'm going to send an email to my supervisor, and say, look, you're sending me on the trip. The trip's going to benefit Morgan Stanley. And unless you respond to my email, I'm going to go buy an iPhone, and you're going to pay me for it. I believe that question presents a different scenario. Here, acceptance by silence, although we contend also the acceptance here was by continued employment. I know that the district court found that silence was the means of acceptance here, but actually the CARE email itself designated something different. The CARE email designated continued employment and failure to opt out as acceptance. In your example, Your Honor, the restatement argument might actually have more play there, because there might not be a reasonable expectation that acceptance by silence in that scenario would be acceptable. Right. I had thought that this particular part of the restatement section on silence as acceptance pertains to customary practice, and is rooted in customary practice. These are all common law doctrines which rely heavily on custom, and contractual norms rely heavily on custom in the relevant domain, and the domain here is this workplace. And the custom in this workplace, and in fact the contractual requirement in this workplace, pursuant to the very terms of the CARE program, as I understand it, is that elements of the program were subject to change. And so that would create an expectation that the employer could change, and that the employer could change the terms, and the employees should be alert to those changes as they happen. And so by the risk of failing to open and read the email, implementing such a change falls on the employee in that situation. It's very much a, what is the customary practice in the employment workplace, and that's informed by the basic contractual terms themselves, and then also what usually happens there. And I see my time is almost up, but we agree. And the custom in the workplace, particularly in this modern age, is using email. Your Honors sent counsel an email via the court system notifying us of today's oral argument, and letting my opposing counsel know that if he did not respond with the amount of time that he wanted for rebuttal, it would not be reserved. This is the means of communicating in the modern age, and it is as sufficient, if not more so, to put Mr. Gupta on notice than would be U.S. mail. Thank you. Thank you. All right. Rebuttal, you had some time left. Thank you, Your Honor. We've got the custom wrong, respectfully. The custom here is if you have an important contract, you want to know about it, you have to sign and initial every single paragraph. That was the original employment agreement. That's the custom. They raised the promissory notes. I'm talking about the terms of the care program. Terms of the care program, it was not a contract that they were involved in. The care program was some policy that they had, which he was not involved with. Suppose that the email came and said... You agree that the terms and conditions are different than the employment agreement? Yes. All right. Those are separate documents, separate agreements. Because he's not part of an agreement. Suppose the email came and said, we are changing the terms of our educational reimbursement policy. This man is not using educational reimbursement policy. He doesn't need to look at it or to go follow it. It's not relevant to him. He wasn't in an agreement on the care arbitration policy. You're suggesting that the care program was not a term and condition of his employment. No, definitely not. It was an offer. It specifically said, you can't go to court... If he wanted to... Let's take the email about the change in the care program off the table. The basic terms of the care program, he was not bound by those. Yes. You are correct. He is not bound by them because they specifically say, you can choose to use the care program if you like, or you can choose to go to court, or we can talk about something else. I know what the care program says, but you're seeming to argue that they're not part of the contract at all. Clearly, they're not. The contract lays out what's there. He signed and initialed every one. I filed a motion to actually see the initialed ones, but we had filed one below where it was blank, and he swore that he had initialed them. But clearly, that is not part of his employment contract. A contract, the freedom to contract, think about this. The freedom to contract has to include a freedom not to contract. Are we going to set something up where an employer can just suddenly change your employment contract? We heard already that delivery is acceptance. That scares me a little bit. If delivery is acceptance, we send an offer, what's going to come? Are we going to end up with an accepting that you're going to buy Girl Scout cookies, raffle tickets, we're going to change the way you're being paid? That really scares me a little bit because this is not about arbitration. It's about contract, and it's about the freedom to contract and I can be bound by a contract without even knowing it. Does the record reveal the sequence between the investigation of Mr. Gupta about the sale of life insurance products versus him being called for his JAG service? Does it say which comes first? I'm sorry, could you clarify the question? Sure. Around the time of the termination, there's two things going on. There's Mr. Gupta being called for JAG core service, and then there is an investigation with regard to the sale of the life insurance products. Does the record reveal which happens first? There's part of it in the record and there's part of it we don't know. In the record, what we do know, and I see my time is up, I may be permitted to answer your question. We do know that the first that Raj Gupta ever knows, he gets called up for active duty in February and he informs them. He says, what do I need to do to take you serially? The response is, don't worry. You're going to have to leave by March the 1st and you're not supposed to take leave until the 10th, so it's not going to matter. We're doing this investigation. There is some confusion between the parties. It's pretty clear, I think, in the record that the investigation was never completed. Raj never got an answer to the investigation. The one thing that we don't know for sure is when the investigation started in that relationship, but we do know this. The prior September, he announced that he'd been promoted to commander. He announced that he would be called up. He didn't know when. And we know that that was almost a year and a half after these insurance products came up. And it looks like Morgan Stanley reached out backwards to ask somebody about them after he announced that he was going to be called up for service. Did that answer your question, Your Honor? Yes, thank you. All right. I thank you very much. We ask that the case be reversed and that Mr. Gupta be able to pursue his USERRA case in court. Thank you. Our thanks to both counsel. The case is taken under advisement. We'll be in recess.